**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**MONROE DIVISION**

| | |
|---|---|
| **JOHN ANDREW NEWBOLD ET AL** | **CASE NO.  3:21-CV-00929** |
| **VERSUS** | **JUDGE TERRY A. DOUGHTY** |
| **KINDER MORGAN S N G OPERATOR L L C ET AL** | **MAG. JUDGE KAYLA D. MCCLUSKY** |

**MEMORANDUM RULING**

Pending before this Court is a Motion for Summary Judgment [Doc. No. 23] filed on behalf of Defendants Kinder Morgan SNG Operator, LLC ("Kinder Morgan") and Southern National Gas Company LLC ("SNG") (collectively "Defendants").  On May 31, 2022, an Opposition [Doc. No. 32] was filed by Plaintiffs David Anthony Newbold ("Newbold"), Briana Caroline Stockett ("Stockett") and Deanna Nicole Smith ("Smith") (collectively "Plaintiffs").  A Reply [Doc. No. 33] was filed by Defendants Kinder Morgan and SNG on June 7, 2022.

For the reasons set forth herein, the Motion for Summary Judgment filed by Kinder Morgan and SNG is GRANTED.

**I.      BACKGROUND**

The determinative issue in this case is whether the location of a boating accident on April 16, 2020, was within the navigable waters of Bayou D'Arbonne.  The parties concede that if the boating accident occurred at a location within the navigable waters of Bayou D'Arbonne, federal maritime law would govern liability in the accident.  The parties also concede that if the location of the boating accident were not within the navigable waters of Bayou D'Arbonne, Louisiana

law would govern liability.  Therefore, as discussed herein, Louisiana's Recreational Use Immunity statutes[1] ("RUS") would bar Plaintiffs' liability claims.

On April 16, 2020, John Newbold ("JN") and his nephew, Jason Rodgers ("Rodgers") spent the day fishing in Bayou D'Arbonne, which is in the D'Arbonne Wildlife Refuge.  JN and Rodgers were in a 14-foot flat bottom aluminum boat that was owned and operated by Rodgers.

JN and Rodgers had been fishing for approximately seven hours and were traveling south on Bayou D'Arbonne, returning to the area where they had launched the boat, when they saw a straight East/West waterbody[2] intersecting the meandering bayou.[3]  JN and Rodgers decided to proceed up the straight waterbody in search of fish.[4]

Rodgers began driving the boat up the waterway, and Rodgers stated he gave the 25-horsepower engine full throttle in a western direction.[5]  As the boat traveled westward, it struck an object which was a "Do Not Anchor or Dredge" pipeline sign ("pipeline sign"), the top of which was located approximately six (6") inches below the water surface.  JN was thrown out of the boat and was struck by the boat's engine, causing injuries.[6] JN allegedly died as a result of these injuries on February 15, 2022.[7]

As it turns out, the straight East/West waterbody was two 50' pipeline right of ways, which were owned by the Defendants, Kinder Morgan and SNG.[8]  Kinder Morgan and SNG provided a survey of the area of the alleged accident.  Project Engineer and Professional Land Surveyor Ronald Riggin declared that the location of the base of the pipeline sign was within the

---

[1] La. R.S. 9:2791 and La. R.S. 9:2795.
[2] Deposition of Jason Rodgers, [Doc. No. 23-3, p. 8-10, and 12-13].
[3] Id. p 17.
[4] Id. p. 9-10.
[5] Id. p. 16
[6] [Doc. No. 1-1, para. 22].
[7] [Doc. No. 29, para. 77].
[8] Declaration of Norman G. "Gregg" Kirk. [Doc. No. 23-4].

Defendants' right of way but located 58 feet west of the western perimeter of the unvegetated channel of the bayou.[9]  There is no disagreement as to the location or dimensions of the pipeline sign, but there is a legal dispute as to whether the location of the pipeline was navigable.

A Petition was filed by Plaintiffs on March 15, 2021, in the Third Judicial District Court, Parish of Union, Civil Docket No. 49,745.  The case was removed to this Court on April 8, 2021.[10]

## II.    LAW AND ANALYSIS

### A.    Motion for Summary Judgment

Summary judgment is appropriate when the evidence before a court shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  A fact is "material" if proof of its existence or nonexistence would affect the outcome of the lawsuit under applicable law in the case.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  A dispute about a material fact is "genuine" if the evidence is such that a reasonable fact finder could render a verdict for the nonmoving party.  *Id.*

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting *Anderson*, 477 U.S. at 247).  "The moving party may meet its burden to demonstrate the absence of a genuine issue of material fact by pointing out that the record contains no support for the non-moving party's claim."  *Stahl v. Novartis Pharm. Corp.,* 283 F.3d 254, 263 (5th Cir. 2002).  Thereafter, if the non-movant is

---

[9] Id. para. 12.
[10] [Doc. No. 1].

unable to identify anything in the record to support its claim, summary judgment is appropriate. *Id.* "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

In evaluating a motion for summary judgment, courts "may not make credibility determinations or weigh the evidence" and "must resolve all ambiguities and draw all permissible inferences in favor of the non-moving party." *Total E & P USA Inc. v. Kerr–McGee Oil and Gas Corp.*, 719 F.3d 424, 434 (5th Cir. 2013) (citations omitted). While courts will "resolve factual controversies in favor of the nonmoving party," an actual controversy exists only "when both parties have submitted evidence of contradictory facts." *Little v. Liquid Air. Corp.,* 37 F.3d 1069, 1075 (5th Cir. 1994). To rebut a properly supported motion for summary judgment, the opposing party must show, with "significant probative evidence," that a genuine issue of material fact exists. *Hamilton v. Segue Software, Inc*., 232 F.3d 473, 477 (5th Cir. 2000) (emphasis added). "'If the evidence is merely colorable, or is not significantly probative,' summary judgment is appropriate." *Cutting Underwater Tech. USA, Inc. v. Eni U.S. Operating Co*., 671 F.3d 512, 517 (5th Cir. 2012) (quoting *Anderson,* 477 U.S. at 248).

Relatedly, there can be no genuine dispute as to a material fact when a party fails "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.,* 477 U.S. at 322-23. This is true "since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id*. at 323.

## B.      Expert Testimony

Kinder Morgan and SNG submitted the declarations of three witnesses.[11]   Plaintiffs

submitted the Affidavits of Robert M. Edmunds ("Edmunds")[12]

### Norman G. Kirk

Norman G. "Gregg" Kirk ("Kirk") is the Supervisor of Operations for the Eastern

Region, Division 9, for Kinder Morgan.  His area of responsibility includes the rights of way

where the boating accident occurred.  He declared the pipeline sign was located within those

rights of way.  Kirk further confirmed that SNG owns the two natural gas pipelines and the

pipeline sign, and Kinder Morgan is the operator.  Kirk also declared that Kinder Morgan hires a

contractor to periodically mow the surface of the rights of way on both sides of Bayou

D'Arbonne.  Kirk also attached copies of the right of way agreements.

### Ronald J. Riggin

Ronald J. Riggin ("Riggin") is a Project Engineer and Professional Land Surveyor with

Lazenby & Associates, Inc.  Riggin declared the area location of the pipeline sign is shown on a

Google Earth satellite photo.[13]   Riggin determined the height and location of the pipeline sign

and addressed water levels at Bayou D'Arbonne and at nearby boat landings over a thirty-year

period.

Riggin declared the pipeline sign at issue was approximately 14.78' in height, the base

elevation of the pipeline sign is 55.59', and the top of the pipeline sign is 70.37'.  Riggin further

declared the pipeline rights of way in the area of Bayou D'Arbonne are subject to seasonal

flooding from the Ouachita River.

---

[11]Declaration of Norman G. "Gregg" Kirk [Doc. No. 23-4]; Declaration of Ronald J. Riggin [Doc. No. 23-5]; and
Declaration of G. Paul Kemp [Doc. No. 23-6].
[12] Affidavit of Robert Martin Edmunds [Doc. No. 32-5].
[13] [Doc. No. 23-5 p. 2].

Riggin determined the water levels at Bayou D'Arbonne and surrounding area over a thirty-year period, from 1992 to 2022.  The water level data was provided to Riggin by Dr. Paul Kemp ("Kemp").  Riggin declared that over the thirty-year period, the highest water levels attained each year on Bayou D'Arbonne have ranged from approximately 60 feet in 1996, 2000, 2006, and 2013 to approximately 79 feet in 2009.

Riggin also determined the water levels at two boat landings located approximately 1,600 feet from the accident location.[14] He declared that when seasonal flooding in the D'Arbonne Refuge reaches the top of the pipeline sign (70.37'), both nearby boat ramps, and roads in between them are also submerged by flooding.

### G. Paul Kemp

G. Paul Kemp ("Kemp") is an Adjunct Professor of Oceanography and Coastal Science of Louisiana State University in Baton Rouge, Louisiana.  He was hired as an expert to research the history of Bayou D'Arbonne to address water levels and vegetation in Bayou D'Arbonne and around the pipeline sign.

Kemp declared that according to the United States Fish & Wildlife Service ("USFWS") map and classification, Bayou D'Arbonne itself was classified as a "riverine and permanently flooded."  Kemp declared that the area of the pipeline sign was as "plustrine with perennial emergent grassy vegetation" which can tolerate semi-permanent, but not permanent, flooding.

Kemp determined the width of the unvegetated channel of Bayou D'Arbonne, at the intersection of the two rights of way, is 597 feet.  Kemp further determined the pipeline sign was located 58 feet away from the western perimeter of the unvegetated channel of Bayou D'Arbonne.

---

[14] Where JN and Rodgers initially put the boat into Bayou D'Arbonne.

Kemp also declared that the base of the pipeline sign was four feet above the elevation of the western perimeter of the unvegetated channel of Bayou D'Arbonne. Kemp examined the water levels for the past thirty years, and determined, relative to Bayou D'Arbonne's unvegetated bed, the SNG pipeline sign and the SNG pipeline rights of way, that:

> (a) 47.8% - the time period when Bayou D'Arbonne water levels are within the unvegetated bed;
>
> (b) 67% - time period that the base of the pipeline sign is on dry land; and
>
> (c) 7.05% - the time period the top of the pipeline sign is submerged by seasonal flooding.

### Robert M. Edmunds

Robert M. Edmunds ("Edmunds") is a thirty-year, retired employee from the Louisiana Department of Wildlife & Fisheries.  Edmunds received his BS in Wildlife Management in 1974 and an MS in Zoology in 1976 from Louisiana Tech University.

Edmunds was hired by Plaintiffs to analyze the vegetation of Bayou D'Arbonne and the location of the pipeline sign on the day of the boating accident.  Edmunds stated that based upon his training and knowledge of plants, and the photos of vegetation found in the area of the pipeline sign, the vegetation is the type he would expect to find in an area that is semi-permanently flooded.  Edmunds identified the vegetation in the area of the pipeline sign as *Quercus lyrata and Brunnichia ovata*, which are reliable indicators that the area is semi-permanently flooded.  It was also Edmunds's opinion that the area of the pipeline sign was not an area that would be suitable for agriculture, grazing, or growing and harvesting desirable or marketable hardwood timber.

C.      Navigability

The primary issue in deciding this motion for summary judgment is whether the area where the collision occurred is navigable.  If it occurred in a navigable waterway, Louisiana's recreational use statutes do not apply.[15]  However, if the location were not in a navigable waterway, Louisiana law applies and Louisiana's RUS bar the claim.

A stream is navigable if, in its ordinary condition, trade and travel are, or may be, conducted over it in the customary modes of trade and travel on water.  The navigable servitude of the government extends to the ordinary high-water mark on either side of the stream.[16]

A river's ordinary high-water mark is set at the line of the shore established by the fluctuation of water.  It is ascertained by physical characteristics such as a clear, natural line impressed on the bank; changes in the character of the soil; destruction of terrestrial vegetation; or other appropriate means that consider the characteristics of the surrounding areas.  The navigational servitude does not burden land that is only submerged when the river floods.[17]

Plaintiffs maintain the area where the accident occurred was "navigable in fact." Property is "navigable in fact" when it is used or susceptible of being used in its ordinary condition to transport commerce.  Susceptibility of use as a highway for commerce should not be confined to exceptional conditions or short periods of temporary high waters.[18]

The expert witnesses of Kinder Morgan and SNG submit facts showing the following:

   1.  SNG owns the gas pipeline rights of way and Kinder Morgan operates
   them;

---

[15] *Buras v. United Gas Pipeline Co.*, 598 So.2d 397, 400 (La. App. 4th Cir. 1992).
[16] *Goose Creek Hunting Club, Inc., v. U.S.*, 207 Ct. Cl. 323 (U.S. Ct. of Claims 1975); *The Daniel Ball*, 77 U.S. 557, 563 (1870).
[17] *Parm v. Shumate*, 513 F.3d 135, 143 (5th Cir. 2007).
[18] *U.S. v. Harrell*, 926 F.2d 1036, 1039-40. (11th Cir. 1991); *United States v. Appalachian Electric Power Company*, 311 U.S. 377 (1940).

2.  Kinder Morgan periodically hires a contractor to mow the surface of the rights of way on both sides of Bayou D'Arbonne;

3.  The pipeline sign was located 58 feet away from the western perimeter of the unvegetated channel of Bayou D'Arbonne;

4.  The pipeline sign was 14.78 feet in height, the base elevation of the pipeline sign was 55.59 feet, and the top of the pipeline sign was 70.37 feet;

5.  The area where the pipeline sign was located is described by the USFWS map as "plustrine with perennial emergent grassy vegetation which can tolerate semi-permanent, but not permanent, flooding";

6.  The base of the pipeline sign was four feet above the elevation of the western perimeter of the unvegetated channel of Bayou D'Arbonne;

7.  Based on the last thirty-year water levels, 47.8% of time, the Bayou D'Arbonne water levels are within the unvegetated bed;

8.  Based on the last thirty-year water levels, 67% of time, the base of the pipeline sign is on dry land; and

9.  Based on the last thirty-year water levels, 7.05% of time, the top of the pipeline sign is submerged by seasonal flooding.

In their opposition, Plaintiffs argue that the US Corp of Engineers established the Ordinary High Water Mark ("OHWM") of Bayou D'Arbonne is sixty-five feet, approximately ten feet over the bottom of the pipeline sign.[19]  Plaintiffs also argue that the USFWS classified the area of the pipeline sign as a semi-permanently flooded water regime, meaning surface water persists throughout the growing season in most years and when water is absent, the water table is usually at or very near the land surface.[20]  Plaintiffs further maintain that based upon this evidence, the area where the pipeline sign was located, is "navigable in fact."

[19] Citing USFWS D'Arbonne National Wildlife Refuge Comprehensive Conservation Plan [Doc. No. 32-4, pp. 22 and 24].
[20] Citing map in Declaration of G. Paul Kemp [Doc. No. 23-6, p. 5].

The burden of proof of navigability rests upon the person asserting it.[21]  Therefore, Plaintiffs have the burden of proof in proving navigability of the area where the pipeline sign was located.

By showing the area of the pipeline sign was 58 feet from the location where vegetation stops, and in showing that the base of the pipeline sign is dry 67% of the time, Kinder Morgan and SNG have shown that the location of the pipeline sign is above the OHWM and not navigable.  The area cannot be used for navigation in its ordinary condition because it is dry 67% of the time. In closely examining Plaintiffs' arguments, Plaintiffs have not created a material issue of fact that the location was navigable.

In Plaintiffs' first argument, they maintain the OHWM at the location was 65 feet, almost ten feet over the base of the pipeline sign.  In support of this claim, Plaintiffs reference the USFWS D'Arbonne National Wildlife Refuge Comprehensive Conservation Plan, pages 22 and 24.[22]  However, this argument is not supported by the evidence Plaintiff references. Page 22 indicates the permanent pool level is 52 feet and that the Corps of Engineers has the right to permanently flood those lands lying below 65 feet.  Page 24 is a map which shows the D'Arbonne National Wildlife Refuge covered at various stages as flooding increases from a permanent pool of 52 feet up to flooding at 70 feet.  This evidence does not support Plaintiffs' position that the OHWM at the location of the accident was 65 feet.

Plaintiffs further argue USFWS classified the area of the pipeline sign as semi-permanently flooded, citing a map in the Declaration of G. Paul Kemp.  Kemp states that the USFWS classified the area of the pipeline sign as PEMIF, meaning "plustrine with perennial

---

[21] *Goose Creek*, 207 Ct. Cl. At 583.
[22] [Doc. No.32-4].

emergent grassy vegetation" which can tolerate semipermanent, but not permanent, flooding.[23]

Neither Kemp, nor his attached map, say the area of the pipeline sign is semi-permanently

flooded.  It only says the vegetation can "tolerate" semi-permanent, but not permanent,

flooding.

Additionally, Plaintiffs submit the Affidavit of Robert M. Edmunds.[24]  Edmunds

classified the vegetation he saw photos of in the area of the pipeline sign as *Quercus lyrate* and

*Brunnchia ovata,* which he indicated was the type of vegetation he would expect to find in a

semi-permanently flooded area.  This does not create a material issue of fact because it is

consistent with Defendant's testimony.  The fact that the area has vegetation at all shows it is

outside of the navigable waters of Bayou D'Arbonne.

Therefore, Plaintiffs have not created a genuine issue of material fact that the area of the

pipeline sign is navigable. Therefore, Louisiana law applies.

### D.    Recreational Use Statutes

Plaintiffs concede that if Louisiana law applies, the Louisiana RUS would bar recovery.[25]

However this Court will examine the RUS to determine whether they bar Plaintiffs' recovery.

The Louisiana RUS are found in two statutes, La. R.S. §§ 9:2791 and 9:2795.

The RUS should be construed with reference to each other.  When the two statutes

conflict, R.S. 9:2795 controls because it is the last enacted and amended statute.[26]   The RUS

are in derogation of common or natural right, and are to be strictly interpreted, and must not be

extended beyond their obvious meaning.[27]  The purpose of the RUS is to encourage owners of

---

[23] [Doc. No. 23-6, para. 10].
[24] [Doc. No. 32-5].
[25] [Doc. No. 32 p. 2].
[26] *Richard v. Hall*, 874 So.2d 131, 151 (La. 2004).
[27] Id at 148.

land to make land and water areas available to the public for recreational purposes by limiting their liability toward persons entering thereon for such purposes.[28]

**La. R.S. 9:2791 states:**

§2791: Liability of owner or occupant of property not used primarily for commercial recreational purposes

A. An owner, lessee, or occupant of premises owes no duty of care to keep such premises safe for entry or use by others for hunting, fishing, camping, hiking, sightseeing, or boating or to give warning of any hazardous conditions, use of, structure, or activities on such premises to persons entering for such purposes, whether the hazardous condition or instrumentality causing the harm is one normally encountered in the true outdoors or one created by the placement of structures or conduct of commercial activities on the premises. If such an owner, lessee, or occupant gives permission to another to enter the premises for such recreational purposes he does not thereby extend any assurance that the premises are safe for such purposes or constitute the person to whom permission is granted one to whom a duty of care is owed, or assume responsibility for or incur liability for any injury to persons or property caused by any act of person to whom permission is granted.

B. This Section does not exclude any liability which would otherwise exist for deliberate and willful or malicious injury to persons or property, nor does it create any liability where such liability does not now exist. Furthermore the provisions of this Section shall not apply when the premises are used principally for a commercial, recreational enterprise for profit; existing law governing such use is not changed by this Section.

C. The word "premises" as used in this Section includes lands, roads, waters, water courses, private ways and buildings, structures, machinery or equipment thereon.

D. The limitation of liability extended by this Section to the owner, lessee, or occupant of premises shall not be affected by the granting of a lease, right of use, or right of occupancy for any recreational purpose which may limit the use of the premises to persons other than the entire public or by the posting of the premises so as to limit the use of the premises to persons other than the entire public.

---

[28] Id at 150.

**La. R. S. 9:2795, in pertinent part, states:**

§2795. Limitation of liability of landowner of property used for
recreational purposes; property owned by the Department of Wildlife
and Fisheries; parks owned by public entities

(1) "Land" means urban or rural land, roads, water, watercourses, private
ways or buildings, structures, and machinery or equipment when
attached to the realty.

(2) "Owner" means the possessor of a fee interest, a tenant, lessee,
occupant or person in control of the premises.

(3) "Recreational purposes" includes but is not limited to any of the
following, or any combination thereof: hunting, fishing, trapping,
swimming, boating, camping, picnicking, hiking, horseback riding,
bicycle riding, motorized, or nonmotorized vehicle operation for
recreation purposes, nature study, water skiing, ice skating, roller
skating, roller blading, skate boarding, sledding, snowmobiling, snow
skiing, summer and winter sports, or viewing or enjoying historical,
archaeological, scenic, or scientific sites.

B.(1) Except for willful or malicious failure to warn against a dangerous
condition, use, structure, or activity, an owner of land, except an owner
of commercial recreational developments or facilities, who permits with
or without charge any person to use his land for recreational purposes as
herein defined does not thereby:

(a) Extend any assurance that the premises are safe for any purposes.

(b) Constitute such person the legal status of an invitee or licensee to
whom a duty of care is owed.

(c) Incur liability for any injury to person or property caused by any
defect in the land regardless of whether naturally occurring or man-
made.

(2) The provisions of this Subsection shall apply to owners of
commercial recreational developments or facilities for injury to persons
or property arising out of the commercial recreational activity permitted
at the recreational development or facility that occurs on land which does
not comprise the commercial recreational development or facility and
over which the owner has no control when the recreational activity
commences, occurs, or terminates on the commercial recreational
development or facility.

13

C. Unless otherwise agreed in writing, the provisions of Subsection B shall be deemed applicable to the duties and liability of an owner of land leased for recreational purposes to the federal government or any state or political subdivision thereof or private persons.

D. Nothing in this Section shall be construed to relieve any person using the land of another for recreational purposes from any obligation which he may have in the absence of this Section to exercise care in his use of such land and in his activities thereon, or from the legal consequences of failure to employ such care.

E.(1) The limitation of liability provided in this Section shall apply to any lands or water bottoms owned, leased, or managed by the Department of Wildlife and Fisheries, regardless of the purposes for which the land or water bottoms are used, and whether they are used for recreational or nonrecreational purposes.

Both Kinder Morgan (operator) and SNG (owner) are "owners" that are entitled to protection under the RUS.  Kinder Morgan is the person in control of the pipelines, and SNG is the owner of the pipelines.

Also, the type of activity JN and Rodgers were engaged in (fishing/boating) is clearly covered under 9:2795 A(3)'s definition of "recreational purposes."  There are no facts submitted or alleged which would result in the alleged failure to warn being "willful or malicious."

Therefore, in accordance with R.S. 9:2795 B and R.S. 9:2791 A, the RUS statutes bar Plaintiffs' claims.

## III.    CONCLUSION

For the reasons set forth herein, the Motion for Summary Judgment [Doc. No. 23] filed by Kinder Morgan and SNG is GRANTED, and Plaintiffs' claims against Defendants are hereby DISMISSED WITH PREJUDICE.

MONROE, LOUISIANA, this 21st day of June 2022.

**TERRY A. DOUGHTY**
**UNITED STATES DISTRICT JUDGE**